ORAL ARGUMENT SCHEDULED FOR JANUARY 9, 2015 AT 9:30 A.M.

———————————

No. 11-1428
(Consolidated with 11-1441 and 12-1427)

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

DELTA CONSTRUCTION COMPANY, INC., et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents.

———————————

On Appeal from the U.S. Environmental Protection Agency
and the U.S. Department of Transportation
76 F.R. 57106, 77 F.R. 51499, and 77 F.R. 51701

———————————

**PETITIONER  PLANT OIL POWERED
DIESEL FUEL SYSTEMS, INC.'S CORRECTED REPLY BRIEF**

———————————

CLAUDE D. CONVISSER
   D.C. Circuit Bar No. 47851
   Plant Oil Powered
   Diesel Fuel Systems, Inc.
   P.O. Box 6397
   Santa Fe, New Mexico  87502
   Telephone:  (505) 310-3840
   Facsimile:  (866) 239-7527
   E-mail: cdc@popdiesel.com

   *Counsel for Petitioner Plant Oil
   Powered Diesel Fuel Systems, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY OF ABBREVIATIONS ............................................... vi

SUMMARY OF ARGUMENT ......................................................... 1

ARGUMENT ..................................................................................... 3

    I.    POP DIESEL HAS STANDING, EVIDENCE
           OF AND ARGUMENTS FOR WHICH ALSO
           SUPPORT ITS CLAIMS ON THE MERITS .............................. 3

          A.    POP Diesel Reasonably Believed That
               Its Standing Was Self-Evident ............................................ 4

              1.    POP Diesel's Engine Technology,
                     Already Subject to Clean Air Act Regulation
                     and EPA Approval, Is Suitable for
                     Contemporary, New, Heavy Duty Engines .............. 2

              2.    POP Diesel Would Be Selling New Heavy
                     Duty Engines Already If the Truck Rule
                     Had Rewarded Its Engine Equipment or
                     100 Percent Plant Oil Fuel According to Their
                     Relative Greenhouse Gas-Mitigating Value ............ 6

              3.    POP Diesel's Products Are the Best of All
                     for Slowing and Reducing Global Warming
                     Resulting from Truck Mobility ................................ 7

i

                                                                           **Page**

    B.    Evidence Apparent in the Record Points to POP
          Diesel's Unique Grounds for Standing to
          Challenge Both the Greenhouse Gas Emissions
          Standards and the Fuel Efficiency Standards ....................   9

    C.    The Truck Rule's Exemption for Small
          Business Should Not Bar POP Diesel's Standing .............   11

    D.    POP Diesel Satisfies the Requisites for
          Constitutional Standing and POP Diesel
          Lies Within the Zone of Interests of the
          Relevant Statutes ...............................................   12

 II.   JURISDICTION OVER POP DIESEL'S
       CHALLENGE TO THE FUEL EFFICIENCY
       STANDARDS LIES WITH THIS COURT .................................   15

III.   THE AGENCIES NEVER CONDUCTED A
       LIFE CYCLE GREENHOUSE GAS EMISSIONS
       COMPARISON BETWEEN ALL THE
       DIFFERENT ENGINE TECHNOLOGIES AND
       THE FUELS THEY ENABLE ......................................   17

IV.    OTHERS FAIL TO ADDRESS DR. HARRY
       SAUNDERS'S ANALYSIS BECAUSE THEY
       CANNOT ESCAPE ITS CONCLUSION OF BACKFIRE ..........   18

 V.    THE RENEWABLE FUEL STANDARD IS
       SYMPTOMATIC OF AN ARBITRARY
       APPROACH TO RANKING ENGINE
       TECHNOLOGIES AND FUELS' RELATIVE
       GREENHOUSE GAS-REDUCING POTENTIAL
       THAT HAS THE EFFECT OF CRUSHING
       MERITWORTHY NEWCOMERS ...............................   20

CONCLUSION ................................................................   22

**Page**

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...............................  23

CERTIFICATE OF SERVICE .........................................................  24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Americans for Safe Access, et al., v. Drug Enforcement Admin.*,
706 F.3d 438 (D.C. Cir.), *cert. den.*, ___ U.S. ___,
134 S. Ct. 673 (2013) .......................................................................... 3, 4, 12

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855,
(D.C. Cir. 2001) ..................................................................................... 14

*City of Dania Beach v. FAA*, 628 F.3d 581 (D.C. Cir. 2010) ........................... 16

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277
(D.C. Cir.), *cert. den.*, 490 U.S. 1106 (1988) ..................................... 13, 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
___ U.S. ___, 134 S.Ct. 1377 (2014) ..................................................... 13

*Massachusetts v. EPA*, 549 U.S. 497 (2009) ................................................. 21

*White Stallion Energy Center v. EPA*, 748 F.3d 1222
(D.C. Cir.), *pet'n cert. filed* (July 14, 2014) ...................................... 13, 14

## Federal Statute

42 U.S.C. § 7521(a)(1) ...................................................................... 20, 21

42 U.S.C. § 7522(a)(1) ......................................................................... 5

42 U.S.C. § 7522(a)(3) ......................................................................... 5

*Authority on which petitioner principally relies is marked with an asterisk (*).

**Page**

42 U.S.C. § 7524(a)(1) ................................................................... 5

42 U.S.C. § 7545(o)(12) ................................................................. 21

49 U.S.C. § 32909(b) .................................................................. 1, 15

 U.S.C. § 32909(c) ..................................................................... 2, 15

## Federal Regulations

40 C.F.R. § 80.1401 ....................................................................... 20

40 C.F.R. § 1415(c)(1) .................................................................. 20

40 C.F.R. §§ 85.501, *et seq* .......................................................... 5

## Federal Rules

Circuit Rule 28(a)(7), Rules of the U.S. Court of Appeals
      for the District of Columbia Circuit ...................................... 3, 9

## Miscellaneous

H.R. Rep. No. 95-294 (1977) ............................................................ 16

S. Comm. on Env't and P. Works, No. 95-16,
      Leg. Hist. of 1977 Clean Air Act Amendments, vol. 4 (1978) ............... 16

## GLOSSARY OF ABBREVIATIONS

ADD ................................................................. POP Diesel's Addendum, Volume 1

CAA ...................................................................................................... Clean Air Act

DOT ................................................ Respondent U.S. Department of Transportation

EPA .......................................... Respondent U.S. Environmental Protection Agency

NHTSA ........................... National Highway Transportation Safety Administration

POP Diesel ......................... Petitioner Plant Oil Powered Diesel Fuel Systems, Inc.

S.A. .............................................. POP Diesel's Supplemental Appendix, Volume 1

## SUMMARY OF ARGUMENT

1.     POP Diesel has standing because its engine enabling equipment, approved under the Clean Air Act, is ready for installation on new heavy duty engines, but the failure of the Truck Rule to reward this technology deters big engine manufacturers from partnering with POP Diesel and denies POP Diesel necessary financing to build new engines on its own.  100 percent plant oil fuel, run through a POP Diesel-equipped engine, has the lowest net, life cycle, greenhouse gas emissions of any heavy duty engine power source.  However, POP Diesel-equipped engines, running on 100 percent plant oil fuel, emit more carbon from the tailpipe than petroleum diesel, rendering these products unfit under the Tailpipe Rule, yet POP Diesel, a peculiarly suitable champion for vindicating the purposes of the Clean Air Act and the Energy Act.  POP Diesel's status as a small business exempt from the Truck Rule should not deny it standing.  POP Diesel's Constitutional standing is self-evident and it falls within the zone-of-interests of Congressional goals for the authorizing statutes.

2.     POP Diesel filed its petition for review in compliance with 49 U.S.C. § 32909(b) within 59 days of the date that the Truck Rule "[wa]s prescribed."  The National Highway Transportation Safety Administration's ("NHTSA") constitutionally suspect, 45-day deadline for service of a petition for

1

reconsideration on it should not bar POP Diesel's petition served on respondent the U.S. Department of Transportation ("DOT") on the 59th day. DOT never delegated authority to promulgate the Truck Rule to NHTSA. DOT is responsible for having received service by hand delivery of POP Diesel's exhibits along with its original petition for reconsideration, which NHTSA claims never to have received. DOT should have treated POP Diesel's petition as concerning the Truck Rule, rather than as a petition for new rulemaking, due in part to the substantial overlap in exhibits between POP Diesel's original petition for reconsideration and its amended and supplemental petition. 49 U.S.C. § 32909(c) gives this Court authority to remand and vacate based on POP Diesel's additional submissions.

3.     The respondent agencies admit that they have never considered, nor see the need to conduct, a comparison of net life cycle greenhouse gas emissions from all of the relevant engine enabling technologies and their fuels or power sources, despite a crying need for them to do so.

4.     Dr. Harry Saunders's quantified conclusion that the Fuel Efficiency Standards cause the Greenhouse Gas Emissions Standards to backfire due to unaccounted-for indirect rebound effects remains unrebutted.

5.     The Renewable Fuel Standard is symptomatic of the government's failure to meet its obligation to slow or reduce global warming caused by trucks

2

because this Standard fails to rank diesel engine fuels eligible for it by calibrating its tradable credits according to their relative greenhouse gas mitigating potency.

## ARGUMENT

## I

## POP DIESEL HAS STANDING, EVIDENCE OF AND ARGUMENTS FOR WHICH ALSO SUPPORT ITS CLAIMS ON THE MERITS

POP Diesel hereby renews its request for leave to file a standing declaration and to allow the government to be able to respond accordingly.  Order of Oct. 2, 2014 (Doc. 1515126) (POP Diesel's motion denied "without prejudice to the merits panel ordering supplemental briefing on standing if needed"); *Americans for Safe Access, et al., v. Drug Enforcement Admin.*, 706 F.3d 438, 445 (D.C. Cir.), *cert. den.*, ___ U.S. ___, 134 S. Ct. 673 (2013) (Court has discretion to allow supplemental filings on standing in which petitioner can raise a new theory of standing).

### A.    POP Diesel Reasonably Believed That Its Standing Was Self-Evident

Even if POP Diesel mis-interpreted what this Court has stated is the "ambigu[ous]" language of Circuit Rule 28(a)(7) by underestimating its burden in

the Petitioner's Opening Brief, "this would not compel *sua sponte* dismissal by the court." *Americans for Safe Access*, 706 F.3d at 444.

### 1. POP Diesel's Engine Technology, Already Subject to Clean Air Act Regulation and EPA Approval, Is Suitable for Contemporary, New, Heavy Duty Engines

It is true, as the respondents ("the government") point out in their brief ("the Government's Brief"), that POP Diesel has not yet secured EPA's certification of Clean Air Act compliance on a new heavy duty engine, and that the Truck Rule pertains to new engines. However, this objection misses a broader point with regards to standing. POP Diesel's having proven the viability of its enabling engine technology and 100 percent plant oil fuel to EPA, there is no technical barrier remaining, only a financial one, to POP Diesel's replicating this feat with new, heavy duty diesel engines.

As a factual declaration would set forth in greater detail, the outside useful life vehicles and engines ("International 6.4 liter engine family") which EPA gave POP Diesel its blessing to retrofit already have on them all of the latest kinds of emissions after-treatment equipment that are present on contemporary, new heavy duty diesel engines, or at least all such CAA compliance equipment that POP Diesel's engine equipment and 100 percent jatropha plant oil fuel could

4

conceivably affect. In other words, from an emissions standpoint, POP Diesel's enabling equipment is good to go on new, heavy duty engines.

It is not true, as the government states in its Brief, at 14, that it did not give an "approval" to POP Diesel's "clean alternative fuel conversion system." Before POP Diesel can engage in the commercial sale of its auxiliary Fuel System and installation on any customer's engine, EPA requires that POP Diesel conduct and pass CAA compliance emissions testing with its enabling equipment running 100 percent plant oil fuel through one or more sample engines belonging to the particular engine family. 40 C.F.R. §§ 85.501, *et seq.* If POP Diesel did not first conduct and pass such emissions testing to EPA's satisfaction on any family of new or existing engines, POP Diesel would be committing a prohibited act under the Clean Air Act. EPA would then have grounds to prosecute POP Diesel under 42 U.S.C. § 7522(a)(1) (new engines) or 42 U.S.C. § 7522(a)(3) (tampering with emissions equipment of an existing engine).[1] Failure to comply may result in a fine of $25,000 per day per engine unit. 42 U.S.C. § 7524(a)(1). The undersigned would state in a sworn declaration that the day after the two agencies gave POP Diesel its first approval concerning the International 6.4 liter engine family, EPA's

---

[1]The text of statutory and regulatory authority cited herein is printed in the Joint Appendix, beginning at J.A. XXXX.

heavy duty compliance officer telephoned him to remind him expressly of POP

Diesel's legal duty and the fines described above.

> **2.    POP Diesel Would Be Selling New Heavy Duty Engines
> Already If the Truck Rule Had Rewarded Its Engine
> Equipment or 100 Percent Plant Oil Fuel According to
> Their Relative Greenhouse Gas-Mitigating Value**

The government points out that POP Diesel has not fulfilled its predictionto

introduce to the market a new POP Diesel-equipped semi truck engine in 2014.

Since the Truck Rule illogically favors other engine technologies and fuels that

make a far less favorable impact on aggregate greenhouse gas emissions than do

POP Diesel's products, and even a harmful impact, established heavy duty engine

manufacturers do not have an incentive to partner with POP Diesel to integrate

POP Diesel's equipment into their engines at their factories for sale on new

engines.  Similarly, without credits for POP Diesel's greenhouse gas-mitigating

engine technology and fuel, POP Diesel is unable to attract financing worth

hundreds of millions of dollars necessary to develop and manufacture such

engines on its own.

Class 7 and 8, long haul trucks contribute 65 percent "of the total

[greenhouse gas] emissions and fuel consumption of the heavy-duty sector,"

"constitute the vast majority of this regulatory category, and form the backbone of

the [Truck Rule's] HD National Program." POP Diesel's Addendum, Volume 1

("ADD"), 40. The government's criticism of POP Diesel for failing to introduce a

POP Diesel-equipped semi truck engine to the market is hollow in the face of POP

Diesel's Fact 3, proposed in POP Diesel's second motion for judicial notice, filed

herewith. Doc. 1520450. This Fact states:

Fact 3:      Due to market uncertainty, both Volvo Trucks and Cummins Engines

             paused or halted their development of long haul engines running on

             liquefied natural gas in 2014.

The cessation of development of a class 7 or 8 natural gas-powered engine is a

blow to the idea that natural gas can play a meaningful part in reducing

greenhouse gas emissions from heavy duty trucks, despite the benefits that the

Truck Rule and other federal programs shower on this alternative fuel promoted

by the petroleum and natural gas industry.

### 3.      POP Diesel's Products Are the Best of All for Slowing and Reducing Global Warming Resulting from Truck Mobility

As POP Diesel's exposition of record evidence of various fuel sources and

engine enabling technologies set forth in Section 2 of its Statement of Facts in

Petitioners' Opening Brief, and as Facts 1 and 2 of its pending motion for judicial

notice[2] exemplify more precisely, POP Diesel's 100 percent plant oil fuel and engine enabling equipment offer singular and superior benefits for greenhouse gas reduction. According to record evidence, running an engine on 100 percent plant oil means replacing fossil fuel consumption with a 100 percent plant based fuel, as compared, for instance, to biodiesel, which most states' laws approve for road use only in a blend called "B-5," consisting of 5 percent biodiesel and 95 percent petroleum. ADD, 351-56, ¶¶ 2.9, 3.8, 5.5, and 5.5.1. Biodiesel has its origins as plant oil or animal fat, called "triglycerides." ADD, 352, ¶'s 3.2 and 3.5. The triglycerides "must undergo a costly and energy-intensive transformation to become a new molecule, called biodiesel." S.A. 1, at 13; ADD, 352 and 355, ¶'s 3.4, 5.2 and 5.3.

Facts 1 and 2, subject to POP Diesel's pending, first motion for judicial notice, state:

Fact 1:     The process of turning 100 percent plant oil into biodiesel consumes approximately the same amount of total energy as is necessary to plant, cultivate, and harvest the plant oil feedstock, extract the oil from it, and transport the oil to the point of processing or sale.

---

[2]Order of Oct. 2, 2014 (Doc. 1515126) deferring to the merits panel a ruling on POP Diesel's first motion for judicial notice, Doc. 1503911.

8

Fact 2:        According to [EPA]'s estimates of leakage of methane from natural

gas production and delivery infrastructure, this leakage likely

presently outweighs the net greenhouse gas savings from using

compressed natural gas to fuel and power heavy duty motor vehicle

engines, as compared to petroleum diesel fuel.

It is a fair deduction to make from Fact 1 that 100 percent plant oil fuel

requires half the energy invested in its manufacture as does biodiesel, and it

manufacture thereby saves half the life, cycle greenhouse gas emissions.  Fact 2, in

addition to Fact 3 set forth earlier, further deflates the myth of natural gas as a fuel

worthy of the Truck Rule's embrace.  Fact 1 corroborates POP Diesel's alignment

with the goals of the Clean Air Act, and therefore, its standing to challenge the

Truck Rule.  Facts 1 and 2 point out the fallacy of the Tailpipe Rule's determining

fuel efficiency and greenhouse gas standards based solely on tailpipe emissions.

**B.     Evidence Apparent in the Record Points to POP
        Diesel's Unique Grounds for Standing to Challenge
        Both the Greenhouse Gas Emissions Standards
        and the Fuel Efficiency Standards**

As was "apparent" in POP Diesel's emissions test results that are part of the

record,[3] 100 percent plant oil fuel emits <u>more</u> carbon from the tailpipe per unit of

_____

[3]Circuit Rule 28(a)(7).

9

work than does petroleum diesel.  This condition is due to the presence of oxygen

atoms attached to every plant hydrocarbon oil molecule, no matter the plant oil

feedstock source, that are not present in petroleum hydrocarbon oil molecules.

This condition deflates the government's false assumption, on which it premises

the Tailpipe Rule, that "fuel consumption and greenhouse gas emissions are

[always] precisely correlated."  Government's Brief, at 45.

The Draft Final Report and the Final Report of POP Diesel's emissions

testing that it submitted to the agencies as an exhibit, respectively, to its petition

for reconsideration and its amended and supplemental petition for reconsideration

recite POP Diesel's higher-than-petroleum tailpipe carbon emissions.  *See* POP

Diesel's Supplemental Appendix and Addendum, Volume 2 (Under Seal), at 275-

311 (Draft Final Report) and 365-410 (Final Report).  In the Draft Final Report,

the comparison of carbon dioxide ($CO_2$) readings from baseline testing on

petroleum diesel, appearing on page 294, are significantly lower than the $CO_2$

results for the same engine with POP Diesel's Fuel System activated and running

on 100 percent jatropha plant oil, appearing on the very next page, page 295, for

each and every of the six engine modes of operation (engine speed and torque

settings) tested.  The overall conclusion, reported in the Final Report in Table 22

on page 395, was that across five of six modes of engine operation, as measured

10

by the Tailpipe Rule, fuel consumption of 100 percent plant oil was a total of around 18 percent more than of petroleum diesel while the engine was performing the same amount of work.

The result of 100 percent plant oil fuel's worse performance than petroleum diesel, by the measure of carbon emissions solely from the tailpipe, is uniform in all the emissions testing POP Diesel has ever done.

Given the foregoing facts, POP Diesel's products, the best combination of engine equipment and fuel for bringing about a real reduction in global warming, based on net life cycle emissions, can never possibly satisfy the straightjacket that the Tailpipe Rule imposes on the Fuel Efficiency and Greenhouse Gas Emissions Standards, further blocking POP Diesel from getting its Fuel System installed on new, heavy duty engines and then selling these engines 100 percent plant oil fuel.

**C.    The Truck Rule's Exemption for Small Business Should Not Bar POP Diesel's Standing**

The Truck Rule exempts small businesses, such as POP Diesel, from its purview.  76 Fed. Reg. 57106, 57122.   Existing, big engine manufacturers appear to be all too happy to maintain the status quo by abiding by a Truck Rule that does not in fact require them to shift to technologies and non fossil-fuel sources that will actually reduce global warming.  In contrast, small companies like POP Diesel

11

often lead the way in innovation.  This Court's denying POP Diesel standing

simply because the Truck Rule exempts small companies would allow the agency

to determine standing by fiat.  Disqualifying a small company from having

standing whose products are particularly beneficial to

achieving statutory goals, yet the regulation particularly aggrieves, would wreak a

perverse result.

**D.     POP Diesel Satisfies the Requisites for Constitutional
         Standing and POP Diesel Lies Within the Zone of
         Interests of the Relevant Statutes**

"'In assessing [petitioners'] standing, [this Court] must assume they will

prevail on the merits of their claims.'" *Americans for Safe Access*, 706 F.3d at 444

(cite omitted).  In POP Diesel's case, this means that:

1.      The Tailpipe Rule is arbitrary and inconsistent with law because it

regulates solely tailpipe carbon emissions, rather than actual fuel consumption and

the true measure of net, life cycle greenhouse gas emissions.

2.      The Truck Rule is causing the emission of more fossil fuel and net

greenhouse gases than if this Rule had not been adopted because the agencies

failed to consider indirect rebound effects arising from mandatory fuel efficiency

standards for commercial trucks.

3.      The Truck Rule is arbitrary and capricious because it fails to take into

account in any respect the favorable greenhouse gas-reducing potential of POP Diesel's engine enabling equipment and 100 percent plant oil fuel.

Like the claims of petitioner Julander in *White Stallion Energy Center v. EPA*, whom the Court considered to be a "vendor," POP Diesel's claims render its Constitutional standing "self-evident" on the elements of injury, causation and redressability.  748 F.3d 1222, 1256 (D.C. Cir.), *pet'n cert. filed* (July 14, 2014).

Moreover, POP Diesel's interest is "'arguably within the zone of interests to be protected or regulated by'" both the Clean Air Act and, as the government calls it, the Energy Act.  *White Stallion*, 748 F.3d at 1256.[4]  The zone-of-interests test "'is not meant to be especially demanding.'"  *White Stallion*, 748 F.3d at 1256 (cite omitted).  This form of standing arises if there is "some indicator that the plaintiff is a peculiarly suitable challenger of administrative neglect [to] support[] an inference that Congress would have intended eligibility" to challenge agency disregard of the law.  *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir.), *cert. den.*, 490 U.S. 1106 (1988).  This indicator exists if there is "'some reason to believe that a [business] firm would be [an] *unusually suitable*

---

[4]POP Diesel does not address the government's challenge to POP Diesel's prudential standing because "'prudential standing is a misnomer' as applied to the zone-of-interests analysis."  *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S.Ct. 1377, 1386 (2014)).

13

*champion*[] of Congress's ultimate goals.'" *White Stallion*, 748 F.3d at 1256 (cite omitted) (emphasis supplied).

POP Diesel is such a champion, if for no reasons other than the special suitability of its products for satisfying the ultimate Congressional goals of reducing overall fossil fuel greenhouse gas consumption and emissions and the penalty that the Tailpipe Rule confers on these products.

POP Diesel's interest does not distort the regulatory process contrary to the intent of Congress. *White Stallion*, 748 F.3d at 258 (cites omitted). Unlike petitioners in *Hazardous Waste* and *Cement Kiln Recycling Coalition v. EPA*, POP Diesel does not seek to impose higher costs or a higher regulatory burden on its engine manufacturing competitors, only to disseminate its engine enabling equipment as widely and at as low a cost as possible so as to sell as much 100 percent plant oil fuel as possible, thereby actually reducing net greenhouse gas emissions, which the Truck Rule does not do. *Hazardous Waste*, 861 F.2d at 285; *Cement Kiln*, 255 F.3d 855, 871 (D.C. Cir. 2001).

In sum, POP Diesel meets all the requisites for standing.

14

**II**

**JURISDICTION OVER POP DIESEL'S
CHALLENGE TO THE FUEL EFFICIENCY
STANDARDS LIES WITH THIS COURT**

POP Diesel complied with 49 U.S.C. § 32909(b) by filing its petition for

review on the 59th day after "the regulation," the Truck Rule, "[wa]s prescribed."

The government objects that POP Diesel did not also file a petition for review of

DOT's administrative denial of what DOT terms POP Diesel's petition for new

rulemaking within 59 days of that denial.  However, according to DOT's own

position, the denial did not pertain to the Truck Rule, but to some form of new

rulemaking.  Therefore, the 59-day deadline of 49 U.S.C. § 32909(b), which refers

to a "regulation," does not apply.  POP Diesel's later filing of a petition for review

on the 60th day after DOT's administrative denial was either superfluous or it

related back to the original petition for review of the Truck Rule, filed on the 59th

day after its publication.  In any event, 49 U.S.C. § 32909(c) provides this Court

with authority to consider new submissions to it and to remand and vacate on the

basis of those submissions, subject to the Court's discretion.

The government also seeks to dismiss POP Diesel's claims against the Fuel

Efficiency Standards by arguing that POP Diesel served its original petition for

reconsideration outside a narrow, 45-day window that NHTSA has created for

itself.

However, as set forth in footnote 1 of the Petitioners' Opening Brief, DOT never delegated any rulemaking authority covering the Fuel Efficiency Standards to NHTSA. POP Diesel's service by hand delivery of its original petition for reconsideration and a complete set of exhibits on the General Counsel's Office of DOT was within the 60-day time window permitted for service of a petition for reconsideration under the Clean Air Act, the companion statute underlying this joint rulemaking. Congress amended the deadline for service of a petition for reconsideration included in the original Clean Air Act from 30 to 60 days based on concerns over due process. H.R. Rep. No. 95-294, at 322 (1977), *reprinted in* S. Comm. on Env't and P. Works, No. 95-16, Leg. Hist. of 1977 CAA Amendments, vol. 4, at 2789 (1978).

This Court should grant POP Diesel's request, deferred to the merits panel, to supplement DOT's administrative record with the exhibits served with its original petition, which NHTSA claims never to have received. *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (approving the supplementation of the administrative record on appeal with documents adverse to the agency that it negligently excluded). The substantial overlap between the original set of exhibits and the set POP Diesel served with its amended and supplemental

16

petition, as set forth at the top of page 21 of the Petitioners' Opening Brief, further debunks DOT's rationale for considering POP Diesel's petition as one for new rulemaking, rather than one challenging the Fuel Efficiency Standards' Tailpipe Rule.

**III**

**THE AGENCIES NEVER CONDUCTED
A LIFE CYCLE GREENHOUSE GAS EMISSIONS
COMPARISON BETWEEN ALL THE DIFFERENT ENGINE
TECHNOLOGIES AND THE FUELS THEY ENABLE**

The government admitted its fundamental misunderstanding of POP Diesel's request for a comparative life cycle emissions analysis, when it stated the following in its Brief, at 50: "An approach focusing instead on emissions from the upstream growth and production of plant-based fuels (or extraction and production of oil) is unrelated to the emissions from a vehicle's fuel combustion."  (emphasis added).  Non-state movant-intervenors point out that the agencies considered upstream emissions that they expect the Truck Rule to reduce by causing a supposed drop in the demand for fuel.  Non-state Movant-intervenors' Brief, at 10 (Doc. 1515273).  However, according to Dr. Harry Saunders's uncontroverted analysis, the agencies' calculations of upstream emissions savings resulting from

17

the Truck Rule were based on a faulty, and fatally understated, conception of the
rebound effect.  The agencies conclusively admit at page 39 of their Brief that they
did not consider or conduct a comparative analysis of upstream emissions savings
from various fuel-enabled engines.

Capturing fuel consumption at the tailpipe is <u>not</u> at all, as the government
posits, "the most direct way to measure a vehicle's greenhouse gas emissions and
fuel consumption."  Government's Brief, at 40.  The most direct way to measure
fuel consumption is to measure how much fuel goes into the engine, and net
greenhouse gas emissions, how much fossil fuel goes in.

<strong>IV</strong>

<strong>OTHERS FAIL TO ADDRESS DR. HARRY<br>SAUNDERS'S ANALYSIS BECAUSE THEY<br>CANNOT ESCAPE ITS CONCLUSION OF BACKFIRE</strong>

The non-state movant-intervenors erroneously characterize POP Diesel's
rebound effect challenge as pertaining to unaccounted-for vehicle miles traveled.
Doc. 1515273, at 18 n.9.  This error demonstrates that they have not even read Dr.
Harry Saunders's uncontroverted, quantitative, economic analysis concluding that
the agencies completely ignored indirect rebound effects unrelated to vehicle miles
traveled, such as the increased demand for manufacturing energy necessary to

18

make additional and new products enabled by savings in shipping costs. Along

these lines, the literature and methods that the two agencies relied on in

formulating their estimate of a 5 to 15 percent rebound effect, listed in the middle

of page 10 of the Government's Brief, are, according to Dr. Saunders, "all limited

to quantifying only direct rebound, not indirect rebound." ADD, 362.

The agencies still have never addressed Dr. Saunders's analysis in

substance. Excerpts they highlighted from the *New Yorker* article that POP Diesel

submitted along with its public comments miss the fundamental point, stated in the

article's last two paragraphs, raising awareness of the negative influence of

efficiency gains on overall energy use. ADD, 253. Because Dr. Saunders's

conclusion defeats the Truck Rule's central mission of reducing aggregate energy

consumption and consequent greenhouse gas emissions, vacatur is necessary.

**V**

**THE RENEWABLE FUEL STANDARD IS
SYMPTOMATIC OF AN ARBITRARY APPROACH
TO RANKING ENGINE TECHNOLOGIES AND
FUELS' RELATIVE GREENHOUSE GAS-REDUCING
POTENTIAL THAT HAS THE EFFECT OF
CRUSHING MERITWORTHY NEWCOMERS**

The government wants to have it both ways by referring POP Diesel to

EPA's Renewable Fuel Standard for a remedy, yet denying POP Diesel's plea for

relief for its plant oil fuel-enabled engines on the grounds that the Truck Rule,

promulgated under 42 U.S.C. § 7521(a)(1), regulates engines, rather than fuels.

Despite Facts 1 and 2 stated above, EPA's Renewable Fuel Standard does not

allow for any differentiation in reward between compression ignition (diesel

engine) fuels based on their drastically varying impacts on mitigating global

warming.  Once EPA determines that an advanced biofuel achieves a 50 percent

reduction in net life cycle greenhouse gas emissions, as compared to the petroleum

diesel baseline, the Renewable Fuel Standard awards tradable credits based solely

on the energy content of the fuel, and not at all on its relative greenhouse gas-

mitigating potency.  *See* 40 C.F.R. § 80.1401 (threshold definition of "advanced

biofuel"); § 80.1415(c)(1) (method for calculating tradable credit value for

renewable fuels not already identified).  If EPA ever acts favorably on POP

20

Diesel's petition pending since February 2011, POP Diesel's 100 percent jatropha plant oil fuel will get only the same tradable credit as a gallon of biodiesel made from jatropha oil. This is despite, as stated in Fact 1 above, the doubling of energy input, and likely doubling of raw greenhouse gases emitted into the atmosphere, required to make biodiesel from its plant oil origin feedstock.

The failure of the Renewable Fuel Standard to recognize this kind of disparity and reward the more life cycle beneficial fuel accordingly cripples newcomer POP Diesel's ability to secure investment and financing, in competition with established biodiesel.[5] Vacatur of the Tailpipe Rule would open the door to redressing this injury. POP Diesel does not seek in this case to strike down the Renewable Fuel Standard, only to show that its is symptomatic of the government's failure to come to grips via the Truck Rule with any new policies

_____

[5]EPA has authority under the savings clause of the statute authorizing the Renewable Fuel Standard to adopt such additional regulations as are necessary to "*slow or reduce*" global warming in the wake of the Supreme Court's decision in *Massachusetts v. EPA*. 549 U.S. 497, 525 (2009) (emphasis supplied). This savings clause states that nothing in the statute or resulting regulations shall "be construed to [] limit [EPA's] regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions [] of" the Clean Air Act. 42 U.S.C. § 7545(o)(12). The Supreme Court in *Massachusetts v. EPA* determined after passage of this statute that EPA has residual authority under 42 U.S.C. § 7521(a)(1) to regulate greenhouse gas emissions, which authority, thanks to 42 U.S.C. § 7545(o)(12), implicitly allows EPA to regulate beyond the bounds of the previously-authorized Renewable Fuel Standard. 549 U.S. at 532-34.

that will actually meet its obligation to slow or reduce global warming caused by classes of trucks.

## CONCLUSION

POP Diesel requests that this Court vacate the Truck Rule and remand for further proceedings.

Respectfully submitted,

Plant Oil Powered
Diesel Fuel Systems, Inc.,
By counsel

/s/  *Claude D. Convisser*
CLAUDE D. CONVISSER
D.C. Circuit Bar No. 47851
Plant Oil Powered
Diesel Fuel Systems, Inc.
P.O. Box 6397
Santa Fe, New Mexico 87502
(505) 310-3840
cdc@popdiesel.com

Counsel for Petitioners Plant Oil
Powered Diesel Fuel Systems, Inc.

DATED:  November 4, 2014

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.

1.    This Reply Brief of petitioner Plant Oil Powered Diesel Fuel Systems, Inc., complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ✔   It contains 4,498 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii), or

    ___   It uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This Reply Brief of petitioner Plant Oil Powered Diesel Fuel Systems, Inc., complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ✔   It has been prepared in a proportionally spaced typeface using WordPerfect X5 in font style Times New Roman and font size 14, or

    ___   It has been prepared in a monospaced typeface using WordPerfect X5 with ____ characters per inch and type style _____.

DATED: November 4, 2014.


                              /s/ *Claude D. Convisser*
                              Attorney for petitioner Plant Oil
                              Powered Diesel Fuel Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2014, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I further certify that on November 5, 2014, I will cause to be served by first class, U.S. mail, postage prepaid, a true and accurate copy of this document on the following:

William H. Sorrell
Office of the Attorney General
State of Vermont
109 State Street
Montpelier, Vermont 05609-1001

and

Oakley Kevin Vincent
Attorney at Law
Baker Botts, LLP
1299 Pennsylvania Avenue, N.W.
The Warner Suite, 1300 West
Washington, D.C. 20004-2400

_____ /s/ *Claude D. Convisser* _____
Claude D. Convisser

24